1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

10

11

CHRISTOPHER D. RAY,

Plaintiff,

CASE NO. C09-5636RJB

12

v.

13

14

15

16

17

18

19

20

CITY OF LACEY, a municipality, OFFICER
LYON, Lacey Police Department, JANE
DOE LYON, husband and wife and the
marital community thereof, OFFICER
MULLEN, LPD, JANE DOE MULLEN, and
the marital community thereof, OFFICER
DAVIE SCOTT, LPD, JANE DOE SCOTT,
and the marital community thereof, OFFICER
JOHN DOE 1, LPD, JANE DOE 1, and the
marital community thereof, OFFICER JOHN
DOE 2, LPD, JANE DOE 2, and the marital
community thereof

Defendants.

**ORDER ON PLAINTIFF'S
MOTION TO AMEND
COMPLAINT AND
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

21

22

23

This matter comes before the Court on Plaintiff's Motion to Amend Complaint (Dkt. 14)

and Defendants' Motion for Summary Judgment (originally Dkt. 11, re-docketed as Dkt. 26).

The Court has considered the motions, opposition to the motions, if any, and the file herein.

24

25

## I.    FACTS AND PROCEDURAL HISTORY

26

27

28

Originally filed in Thurston County, Washington Superior Court, Plaintiff brings this

case pursuant to federal law alleging that his rights were violated when he was arrested and his

children were placed in protective custody.  Dkt. 1.  Plaintiff also makes state law claims.  *Id.*

## A.     FACTS

Plaintiff and his wife, Shawna Curow-Ray married in April of 2007.  Dkt. 27, at 5.

According to Ms. Curow-Ray, in February or March of 2007, they began to use

methamphetamine ("meth").  Dkt. 27, at 6.  At first they used meth every two weeks, but by June

of 2007, it got to be an $80.00 a day habit.  Dkt. 27, at 6.  The couple had a son together, T.R.

(age 6 at the time of these events), and Ms. Curow-Ray had a daughter from a previous

relationship, T.C. (age 11).  Dkt. 27, at 5.  Ms. Curow-Ray testified that, "I know that I wasn't

the best mother during that period.  I know that their needs got set aside for my addiction.  I

don't think I'll ever fully know what I have completely done to my kids."  Dkt. 27, at 6.  She

testified that due to their drug habit and "lifestyle" the children were left alone, and put

themselves to bed at night.  Dkt. 27, at 7.  Ms. Curow-Ray testified that by June of 2007, she and

Mr. Ray were having verbal arguments over money.  Dkt. 27, at 7.

Ms. Curow-Ray testified that her memory at the time was "real fuzzy."  Dkt. 27, at 6.

She testified that on Friday, June 15, 2007, she and Mr. Ray were at a friend's house.  Dkt. 27, at

7.  Ms. Curow-Ray testified that she would go on "two-or three- day binges" using meth, and

this was the second day of the binge.  Dkt. 27, at 8.  Mr. Ray states that he did not use drugs that

night.  Dkt. 20, at 1.  Mr. Ray left Ms. Curow-Ray at the friend's house, without a way to get

home.  Dkt. 27, at 7.  Ms. Curow-Ray testified that she called a friend to come and get her, and

when she got home, (around 1:30 a.m. on the 16th), a big argument began between she and Mr.

Ray.  Dkt. 27, at 8.

Ms. Curow-Ray testified that she left the house for several hours, and returned in the

morning.  Dkt. 27, at 8.  She states that when she returned home, there was a man in the garage

with Mr. Ray that she did not like.  Dkt. 27, at 8.  She stated that the man sometimes supplied

them with drugs.  Dkt. 27, at 8.  She stated that when she saw that man, she thought there was

going to be more drugs at their house.  Dkt. 27, at 9.  She testified that she wanted to get clean

and not continue down the path that they were on.  Dkt. 27, at 9.  She states that when she saw

that man in the garage with her husband, she got angry.  Dkt. 27, at 9.  Ms. Curow-Ray testified

1   that she then went into the garage, began to yell at Mr. Ray and "got real aggressive" with him.

2   Dkt. 27, at 8.  Ms. Curow-Ray testified that: "I remember yelling at him.  I walked up to him,

3   pushed him, and then I swung and punched him in his eye.  I continued to grab at him.  I was

4   trying to knock him down." Dkt. 27, at 9.  She states that after she punched him in the eye, he

5   shoved her and she fell back a couple of steps.  Dkt. 27, at 9.  Ms. Curow-Ray, in her

6   declaration, describes the incident like this:  "[a]s part of his attempt to get by me, when I

7   refused to move out of his way and began hitting him with all my might-again, because I was

8   trying to hurt him-Chris defended himself by pushing me aside with one hand so that he could

9   leave." Dkt. 21, at 1.  She states that she tripped on the "step into the house and hit the

10   doorjamb." Dkt. 27, at 9.  Ms. Curow-Ray testified that as a result of hitting the doorjamb, she

11   suffered an elevated collar bone and a "pretty good bruise" on her left thigh.  Dkt 27, at 11.  Mr.

12   Ray acknowledges that he shoved her and she struck the doorjamb as a result.  Dkt. 27, at 33.

13   Mr. Ray states that he had started packing his things in his car to leave.  Dkt. 20, at 1.

14       In any event, they then entered the house, and Ms. Curow-Ray states that she went into a

15   bedroom with her daughter to calm down and tried to watch a movie.  Dkt. 27, at 9-10.  She

16   testified that Mr. Ray eventually came into the bedroom to retrieve the VCR or TV that they

17   were using, and they began to yell at each other again.  Dkt. 27, at 9-10.  Ms. Curow-Ray states

18   that although her memory is "real fuzzy" at this point, she thinks that they came out of the

19   bedroom yelling at each other.  Dkt. 27, at 10.  Ms. Curow-Ray testified that she didn't know

20   how he ended up on top of her on the couch.  Dkt. 27, at 10.  Mr. Ray testified that he had no

21   memory of this couch incident (Dkt. 27, at 33), but then filed a declaration in response to the

22   summary judgment motion and stated that Ms. Curow-Ray attacked him, and when he moved to

23   get away, he tripped and they fell on to the couch.  Dkt. 20, at 2.  Ms. Curow-Ray states that

24   while they were on the couch,  her daughter jumped on Mr. Ray's back and yelled, "get off my

25   mom!" Dkt. 27, at 10.  Ms. Curow-Ray testified that she remembered Mr. Ray grabbing her

26   daughter and feeling scared.  Dkt. 27, at 10.  She testified that she thought "Oh gosh, now he's

27   going to hurt her.  But he let her go." Dkt. 27, at 10.  Mr. Ray states that he then called his

28

ORDER
Page 3

1  mother, Donna Ray, to get help moving his stuff out of the house.  Dkt. 20, at 2.

2         T.C., the eleven year old daughter, testified that about a half an hour after the couch

3  incident, there was another conflict between her parents.  Dkt. 27, at 40.  She testified that she

4  didn't know who pushed first, but that her mother "like was hit against the door or was pushed.

5  She tripped into the doorjamb thing."   Dkt. 27, at 40.  She states that her mother hit her

6  shoulder.  Dkt. 27, at 40.

7         Ms. Curow-Ray testified that after the couch incident, Mr. Ray's mother, Donna Ray,

8  showed up.  Dkt. 27, at 10.  Ms. Curow-Ray states Mr. Ray and she continued to argue as Mr.

9  Ray was loading his car up with stuff.  Dkt. 27, at 10.  She states that she came at him again and

10  he pushed her again to get her "out of his face."  Dkt. 27, at 10.  At this point, Ms. Curow-Ray

11  called the police.  Dkt. 27, at 10.

12         Mr. Ray testified that as a result of their fight, he had a swollen eye and had some

13  scratches on his neck.  Dkt. 27, at 33.  He testified that he was injured a "very little."  Dkt. 27, at

14  33.

15         T.C. (age 11), testified that she spoke with the Lacey police officers.  Dkt. 27, at 41.  She

16  stated that she told them that she saw her parents yelling at each other and that they got into a

17  physical fight.  Dkt. 27, at 41.  T.C. testified that she told them that she pulled her dad off of her

18  mom.  Dkt. 27, at 41.  T.C. stated that she told the officers that her mom injured her shoulder

19  when she made contact with the doorjamb during the fight with her dad.  Dkt. 27, at 41.

20         The record contains two Lacey Police Department Officer's Reports:  one written by

21  Officer Davie Scott, a Defendant here, and the officer who placed Mr. Ray under arrest, and

22  Officer J. Mullen, also a Defendant here.  Dkt. 27, at 54-57.  Officer Scott states, in his report,

23  that he responded to a domestic violence incident in progress at Plaintiff's residence on the day

24  in question.  Dkt. 27, at 56.  He states that he interviewed Mr. Ray while Officer Mullen talked

25  with Ms. Curow-Ray.  Dkt. 27, at 56.  Officer Scott reports that Mr. Ray informed him that the

26  couple had been involved in a disagreement the night before.  Dkt. 27, at 56.  Officer Scott

27  reports that Mr. Ray stated:

28

Shawna returned to the home today and confronted Christopher while he was attempting to pack his belongings in the garage. Christopher told [Officer Scott] that Shawna pushed him as she went into the house, resulting in a physical confrontation. During the incident Shawna was able to punch Christopher in his right eye, causing some noticeable swelling and scratch under the eye. . . Christopher denied hitting Shawna during the incident.

Dkt. 27, at 56. Officer Scott reports that he then interviewed Ms. Curow-Ray. Dkt. 27, at 56.

He reports Ms. Curow-Ray acknowledged the fight the night before and further told him that:

[W]hen she returned to the home today, she discovered Christopher in the garage with two of his friends. Shawna described the men as "tweakers" (methamphetamine users). Shawna said she became upset and told Christopher to leave the home. Shawna explained she pushed Christopher as she went into the house. She and Christopher began to struggle and she punched Christopher in the right eye. Shawna told me she then went into the living room to watch movies with her daughter [T.C.]. Christopher entered the living room area and began to snatch the DVD player from the wall. Shawna said, "when I tried to stop him, he threw me over the table and onto the couch and held me down, he shook me really hard and slapped me." Shawna informed me that she felt pain in her shoulders from the incident. Shawna said she told Christopher, "Just leave and get your things later." Shawna informed [Officer Scott] she followed Christopher into the garage demanding that he leave the home. Christopher pushed Shawna as he turned around to go back into the home, causing Shawna to hit the right side of her head on the doorframe, nearly knocking her unconscious. Shawna informed [Officer Scott] Christopher began to taunt her by saying, "I got the mark, I'm calling the police and you're going to jail."

Dkt. 27, at 56-57. Officer Scott reports that he touched Ms. Curow-Ray's head and felt swelling near her temple. Dkt. 27, at 57. Officer Scott stated "[b]ased on my observation Christopher could have chosen to leave the home and return for his items later. Christopher was also the primary aggressor during the incident." Dkt. 27, at 57. Officer Scott decided to arrest Mr. Ray for domestic violence. Dkt. 27, at 57.

Officer J. Mullen's report also states that he interviewed both Mr. Ray and Ms. Curow-Ray at the time of the incident. Dkt. 27, at 54. His report states:

[Ray] stated he just got in a fight with his wife, V-1 Shawna Curow. Ray said he just wanted to leave. Ray said Curow punched him in the eye. It appeared Ray's left eye was slightly swollen and it appeared a bruise was forming. Ray said that he also pushed Curow after she punched him in the face.
Officer Scott then arrived on the scene and spoke with Ray while [Officer Mullen] contacted Curow who was still inside the residence. Curow's hands were shaking and it appeared she possibly was under the influence of drugs. Curow was having a hard time speaking clearly and was not making much sense in her statements. Curow said she was very upset because she had been fighting with Ray and drugs had been brought back into their lives. After speaking with Curow for several minutes I asked her if she was under the influence of drugs. Curow

looked at me and said, "yes, well you saw my hands shaking."
Curow stated . . . when she returned Ray had two friends over in the garage that she referred to as "tweakers."  Curow said she became even more upset and told them to get out of her house and asked Ray to leave.  Curow said she then pushed past Ray in an effort to get into the house from the garage area and they began to struggle.  Curow said she then hit Ray in the face with a closed fist.
Curow said she then went into the bedroom and was watching a movie with her daughter when Ray came in and took the DVD player.  Curow said they were standing in the living room when Ray pushed her and she and she slapped him across the face.  Curow said Ray then pushed her down on the couch and their daughter W-1 [T.C.] pulled him off of her.
Curow said she then followed him out into the garage and continued yelling at him.  Curow said she thought Ray was leaving, but he started to go back into the house.  Curow say they began to struggle again and he pushed her backwards and she hit her head on the door frame that leads to the house from the garage.  Curow said she hurt her shoulder and hit her head.

Dkt. 27, at 56.

Officer Lyon, also a Defendant here, states that he also responded the call regarding domestic violence at Plaintiff's residence on June 16, 2007.  Dkt. 12, at 1.  Officer Lyon states that when he arrived, Officer Scott asked him to help secure Donna Ray because she "would not calm down and was interfering with his investigation."  Dkt. 12, at 1-2.  He states that he stayed with her while the other officers conducted the investigation.  Dkt. 12, at 2.  He states that he did not conduct any of the interviews or investigation leading to Mr. Ray's arrest.  Dkt. 12, at 2.  He states that he overheard the other officers discussing the arrest of Mr. Ray as the primary aggressor, and explained that to Donna Ray.  Dkt. 12, at 2.  He states that he left the scene after Mr. Ray was transported and had no further involvement with the parties.  Dkt. 12, at 2.

In her declaration filed in response to the summary judgment motion, Ms. Curow-Ray states that she told the officers that it "was [her] fault the argument continued. [She] struck first, [she] had scratched, and [she] had shoved Chris." Dkt. 21, at 2.  She states that she told the officers that Mr. Ray had not hit her, and that she was not afraid of him. Dkt. 21, at 2.  She states that she did not remember telling the officers that Mr. Ray was a drug user.  She states that she "was making no sense, partly because of [her] emotions and because [she] was high at the time." Dkt. 21, at 2.

Ms. Curow-Ray testified after the police left with Mr. Ray, her father, Cal Curow, who owned the house they were living in, told her he was evicting them.  Dkt. 27, at 12.  Ms. Curow-

Ray states that they discussed either Cal Curow or her brother, Dean Curow, taking her daughter, T.C., for the summer.  Dkt. 27, at 12.  Ms. Curow-Ray testified that she was "fine" with her daughter going to her brother's for the summer.  Dkt. 27, at 12.  Ms. Curow-Ray testified that she asked Mr. Ray's mother, Donna Ray, to keep her son T.R. but not necessarily for the whole summer.  Dkt. 27, at 13.

Ms. Curow-Ray states that at Donna Ray's urging she went to the hospital on Sunday, June 17, 2007, regarding her shoulder.  Dkt. 27, at 13.  She states that she had an x-ray done, had to wear a sling, and completed follow up visits because "they weren't sure" if she needed surgery.  Dkt. 27, at 11.

Ms. Curow-Ray testified that on Monday, the 18th of June, she went to a Department Social and Health Services ("DSHS") office.  Dkt. 27, at 13.  The record does not state which DSHS office.  She states that she completed a mini drug evaluation and was being evaluated for domestic violence counseling.  Dkt. 27, at 13.  Ms. Curow-Ray testified that she left that DSHS office, called her brother, Dean, and told him that she wanted T.C. back.  Dkt. 27, at 13.  He told her "no."  Dkt. 27, at 13.  She states that around noon she then called her dad and told him her brother would not return T.C.  Dkt. 27, at 13.  She relates that her dad told her that he and Dean were filing for temporary custody of T.C. at the Tumwater, Washington, DSHS office.  Dkt. 27, at 13.  Ms. Curow-Ray states that she called the police from Donna Ray's house and drove to the Tumwater DSHS office, around 15-20 minutes away.  Dkt. 27, at 13-14.

Ms. Curow-Ray states that City Tumwater police officers met her outside the Tumwater DSHS office.  Dkt. 27, at 13.  The Tumwater police officers are not defendants in his action, but are defendants in a separate action filed by Mr. Ray, Ms. Ray and Donna Ray.  *Curow-Ray v. City of Tumwater,* Western District of Washington case number 09-05633 RJB.  In any event, Ms. Curow-Ray states that the Tumwater officers asked her how long she'd been clean, and she told them three days.  Dkt. 27, at 13.  Ms. Curow-Ray states that she "explained the situation, what happened, explained to them what [she] had been doing and what [she] was trying to do with the treatment and stuff."  Dkt. 27, at 13.  Ms. Curow-Ray states that it "got a little ugly

outside because they found out [she] was a drug addict." Dkt. 27, at 13.  Ms. Curow-Ray

acknowledges that she told them that she was a meth addict, there had been a domestic violence

incident two days ago, and her husband was still in custody for that event. Dkt. 27, at 14.  Ms.

Curow-Ray further told the Tumwater police officers that she had not entered treatment, was

trying to enter treatment, and was "teetering" on the edge of using meth again that day.  Dkt. 27,

at 15.  She testified that the officers told her that she "had to go upstairs [into the DSHS office]

and talk to one of the workers."  Dkt. 27, at 15.  She testified that she "willingly" went.  Dkt. 27,

at 15.

Ms. Curow-Ray testified that she and the Tumwater officers went into an office with a

long table.  Dkt. 27, at 14.  She testified that a DSHS worker, Rebecca Neal, came in and

explained what was "going on" and "that her kids were being placed into protective custody."

Dkt. 27, at 15.  Ms. Curow-Ray states that they kept asking her about T.R.'s location.  Dkt. 27, at

15.  Ms. Curow-Ray says that "she fought it" for about 40 minutes, but then was told that she

would be charged with endangering a minor if she did not produce T.R.  Dkt. 27, at 15.  She

testified that she felt "backed into a corner . . . it was either throw [her] kids into foster care or

send [her] kids with [her] brother."  Dkt. 27, at 16.  (She acknowledges that her brother and his

wife were a good parents.  Dkt. 27, at 16.)  Ms. Curow-Ray testified that she felt that it was Ms.

Neal who was not giving her a choice.  Dkt. 27, at 20.  Ms. Curow-Ray states that she knew that

she was being accused of neglecting her kids based upon her daughter's statements about being

left alone.  Dkt. 27, at 16.  Ms. Curow-Ray states that she called Donna Ray and asked her to

bring T.R. to her at the DSHS office, and Donna refused.  Dkt. 27, at 18.  Tumwater Officer Jon

Weiks called Donna Ray and told her that if she did not bring T.R. to them, she would be

charged with a crime.  Dkt. 27, at 18, and 48.  Donna Ray refused.  Dkt. 27, at 49.  Ms. Curow-

Ray testified that she then called Donna Ray back and told her that she had to bring T.R. to her at

the DSHS office.  Dkt. 27, at 18.  Donna Ray agreed at that point, and brought T.R. to the

Tumwater DSHS office.  Dkt. 27, at 18.  Donna Ray stated that she was never held against her

will by a Tumwater police officer.  Dkt. 27, at 52.

Ms. Curow-Ray signed Voluntary Placement Agreements placing both T.C. and T.R. with her brother Dean Curow from June 18, 2007 to July 30, 2007. Dkt. 27, at 17, at 58-59. Mr. Ray also signed the Voluntary Placement Agreements. Dkt. 28, at 4. The Voluntary Placement Agreements were not extended beyond July 30, 2007. Dkt. 27, at 17. Ms. Curow-Ray testified that the Tumwater police officers were in the room during her conversation with Ms. Neal regarding the Voluntary Placement Agreements, but she "kept telling them to shut up and quit talking." Dkt. 27, at 20. Although she states that she was in a locked room, she did not ask to leave prior to signing the Voluntary Placement Agreements, and was "not leaving that office without her kids." Dkt. 27, at 20.

Mr. Ray was arraigned in Thurston County Washington, District Court in the afternoon of July 18, 2007. Dkt. 27, at 24. Upon reviewing the statement of probable cause, the court initially found that there was probable cause for Mr. Ray's arrest. Dkt. 27, at 26. After hearing that the prosecutor was unsure whether charges would also be filed against Ms. Curow-Ray, the following exchange took place:

> The Court: Well, I will tell you this, I mean, maybe I should just not find probable cause until you decide what you are going to do then . . . Because it's unequal justice, in my opinion. I'm just not going to find probable cause at this point in time.
> Prosecutor: Well, okay.
> The Court: So you get to decide . . .
> Prosecutor: Well - -
> The Court: I'm not - - I'm sick and tired of  - - -
> Prosecutor: I understand the issue, with all due respect. But I'm not - -
> The Court: Well, then both parties need to be charged or neither party needs to be charged.
> Prosecutor: Well. . .
> The Court: So right now I'm going to not find probable cause and you are released on PR. If you go back there, Mr. Ray, you're probably going to be ended up with not only this case, which I will allow the city to refile because I'm dismissing it without prejudice at this point, but you are going to have another charge as well.. .

Dkt. 27, at 28-29. Mr. Ray was released from custody and moved in with his mother for a period of time. Dkt. 28, at 4.

Ms. Curow-Ray testified that near the end of July 2007, the children were returned. Dkt. 27, at 18. Ms. Curow-Ray states that while her brother Dean Curow  had the children, he

1  allowed her to visit them.  Dkt. 27, at 18.

2  **B.    PROCEDURAL HISTORY**

3  Plaintiff's complaint alleges that on June 16, 2007, at around 11:30 a.m., Defendant

4  police officers responded to a noise complaint from Plaintiff's neighbor.  Dkt. 1-3.  He alleges

5  that Plaintiff's wife admitted to one of the police officers that she had "struck, scratched, and

6  shoved the Claimant."  *Id.*, at 8.  Plaintiff alleges that "[i]n self defense and in order to leave the

7  premises, plaintiff shoved his wife aside and left the home."  *Id.*   He alleges that he then got into

8  his car and drove away at "a normal and safe speed."  *Id.*  Plaintiff alleges that he was stopped by

9  the police officers.  *Id.*  Plaintiff alleges that his wife ran out of the house and yelled, "don't

10 arrest him, it was me."  *Id.*  Plaintiff asserts that the officers discussed it among themselves, and

11 then arrested him.  *Id.*  He asserts that he was jailed for three days and criminal charges were

12 filed.  *Id.*  Plaintiff alleges that the "charges were thrown out of court."  *Id.*  He alleges that "[a]s

13 a result of the actions of the Lacey Police Department, the Tumwater Police Department (without

14 speaking to Plaintiff), acted in concert with Lacey Police Department, and removed the

15 Plaintiff's two children [T.C.] (step daughter) and [T.R.] (son) from his care because he had been

16 arrested."  *Id.*

17 Plaintiff alleges that Defendants have "deprived him of his fundamental right to his

18 children's companionship," have violated his civil rights, and references 42 U.S.C. § 1983.  *Id.,*

19 at 10.  Plaintiff brings "claims against the Defendants . . . for their conspiracy to interfere with

20 civil rights in obstructing justice to Plaintiff, and by intimidation or threat to the Plaintiff, and

21 depriving the Plaintiff of rights and privileges pursuant to 42 U.S.C. § 1985 (1), (2), and (3)."

22 *Id.,* at 10-11.  Plaintiff alleges a claim of negligent hiring and retention against Defendant City of

23 Lacey.  *Id.*  Plaintiff asserts state law claims for false imprisonment and arrest, negligent training

24 and supervision, outrage, and interference with family relations.  *Id.,* at 8-10.

25 **C.    PENDING MOTIONS**

26 1.    Plaintiff's Motion for Leave to Amend Complaint

27 On July 2, 2010, a few days after Defendants filed their motion for summary judgment,

28

1   Plaintiff filed the instant motion, seeking leave to amend his complaint to add a "claim of a

2   violation of the Defendant's [sic] rights under the equal protection clause of the 14th amendment

3   against defendant police officers and the City of Lacey under 42 U.S.C. § 1983." Dkt. 15, at 2.

4   Defendants oppose the motion for leave to amend the complaint. Dkt. 17. Defendants argue that

5   the motion should be denied because amendment would be futile and would prejudice the

6   Defendants. *Id.*

7                       2.   Defendants' Motion for Summary Judgment

8        On June 30, 2010, Defendants filed a Summary Judgment Motion, seeking dismissal of

9   all Plaintiff's claims. Dkt. 26 (originally filed as Dkt. 11 refiled as Dkt. 26 in redacted form).

10  As to the federal claims, Defendants argue that:  1) they are entitled to qualified immunity as to

11  the claims brought pursuant to 42 U.S.C. § 1983, 2) there is no basis for liability under 42 U.S.C.

12  § 1985, and 3) there is no basis for municipal liability under *Monell v. N.Y. City of Dept. of Soc.*

13  *Services,* 436 U.S. 658, 694 (1978). Dkts. 26 and 24.

14       Defendants argue that the state law claims should be dismissed because:  1) the

15  individually named officers are entitled to immunity for all state law claims, 2) there was

16  probable cause for Mr. Ray's arrest, 3) Plaintiff's claims against the City of Lacey for negligent

17  training and supervision are precluded by the public duty doctrine, 4) there is no evidence to

18  support a claim for negligent training or supervision, 5) there is no evidence to support a claim

19  for outrage, and  6) Plaintiff's claim for interference with family relationships should be

20  dismissed. Dkts. 26 and 24.

21       Plaintiff filed a response and moved to strike the two police reports and the Declaration

22  of Officer Lyon. Dkt. 19. Plaintiff also argued that his federal law claims should not be

23  dismissed because his rights to family unity were violated and those rights were clearly

24  established. Dkt. 19. Plaintiff argues that his federal conspiracy claims should not be dismissed.

25  Plaintiff argues that Defendants violated the Plaintiff's rights of equal protection. Dkt. 19.

26  Plaintiff argues that "there is sufficient evidence to show that Mr. Ray was treated differently

27  than his own wife. Ms. Curow-Ray . . . admitted liability and her demeanor much more closely

28

matched the "primary aggressor" criteria of the Lacey Police Department." Dkt. 19. Plaintiff argues that is a question of fact for the jury as to whether this differing treatment was the result of gender bias. Dkt. 19.

As to the state law claims, Plaintiff argued that there was no probable cause for his arrest, so the officers were not entitled to immunity, and that the claims of good faith and absence of malice are only for the jury to decide. Dkt. 19. Plaintiff argues that because there was no probable cause for his arrest, his claim for false arrest and false imprisonment should not be dismissed. Dkt. 19. Plaintiff argues that the public duty doctrine does not apply because he is not alleging negligence based upon a discretionary governmental conduct, so the motion should not be denied as to his negligent hiring, retention, training and/or supervision claims. Dkt. 19. Plaintiff argues that there is evidence that the City of Lacey is liable for negligent training and supervision of the individual officers because they did not follow the City of Lacey policy on domestic violence. Dkt. 19. Plaintiff argues that his claim for outrage should not be dismissed because he was trying to flee the scene when the officers contacted him, he was not the intoxicated party, he had a bruise forming under his eye, and told the officers he was acting in self defense. Dkt. 19. Plaintiff argues that his malicious interference with family relations should not be dismissed because there was an existing family relationship and "whether removal was malicious is a question of fact because" the officers had adequate probable cause to arrest Ms. Curow-Ray and choose to arrest Mr. Ray. Dkt. 19.

Defendants also move to strike Plaintiff's response to the summary judgment as it was untimely. Dkt. 24.

## C.    ORGANIZATION OF OPINION

This opinion will consider Plaintiff's motion to amend (Dkt. 14), Plaintiff's motion to strike (Dkt. 19), Defendants' motion to strike (Dkt. 24), and Defendants' motion for summary judgment (Dkt. 26), in order.

## II.    <u>DISCUSSION</u>

## A.    MOTION TO AMEND

1    Fed. R. Civ. P. 15(a)(1) permits a party to amend the complaint before being served with

2    a responsive pleading; or within 20 days after serving the pleading if a responsive pleading is not

3    allowed and the action is not yet on the trial calendar.  In all other cases, Fed. R. Civ. P. 15(a)(2)

4    provides that "a party may amend its pleading only with the opposing party's written consent or

5    the court's leave. The court should freely give leave when justice so requires."  "Five factors are

6    taken into account to assess the propriety of a motion for leave to amend:  bad faith, undue delay,

7    prejudice to the opposing party, futility of amendment, and whether the plaintiff has previously

8    amended the complaint.  Futility alone can justify the denial of a motion to amend."  *Johnson v.*

9    *Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004)(*internal quotations and citations omitted*).

10    Plaintiff's motion amend his complaint to assert a claim for violation of his equal

11    protection rights against the Defendant police officers and City of Lacey (Dkt. 14) should be

12    denied without prejudice.  It is unclear what Plaintiff's exact allegations would be because

13    Plaintiff failed to attach a proposed amended complaint.  Accordingly, whether Plaintiff's

14    motion for leave to amend is futile is equally unclear.  Plaintiff should have until August 27,

15    2010, to file a proposed amended complaint, if any, on the equal protection claim alone.

16    Plaintiff should be mindful that this Order becomes the law of the case, including the factual

17    findings and legal conclusions made herein.

18    **B.    MOTIONS TO STRIKE**

19    Plaintiff moves to strike the police reports of Officers Scott and Mullen, and the

20    declaration of Officer Lyon, because these documents contain hearsay.  Dkt. 19.  Plaintiff's

21    motion to strike the police reports and the declaration should be denied.  Defendants properly

22    point out that these sworn police reports and the declaration are being offered to show, not the

23    truth of the statements therein, but the officers' state of mind at the time of the arrest, and are

24    accordingly exceptions to the hearsay rule.  Fed. R. Evid. 801 (c); 803.  Further, Ms. Curow-

25    Ray's statements regarding her injuries were statements of her "then existing . . . . physical

26    condition" and are also exceptions to the hearsay rule.  Fed. R. Evid. 803(3).

27    Plaintiff further object to Officer Lyon's Declaration, arguing that it was not relevant to

28

1   the incident for which Mr. Ray was arrested. Dkt. 19. Fed. R. Evid. 401 provides that relevant

2   evidence is "evidence having any tendency to make the existence of any fact that is of

3   consequence to the determination of the action more or less probable than it would be without

4   the evidence." Officer Lyon's Declaration is relevant because it shows his role was very

5   minimal in the events in question, even though Plaintiff seeks to hold him liable for his arrest.

6   Plaintiff's motion to strike Officer Lyon's declaration should be denied.

7        Defendants move to strike Plaintiffs' response to the summary judgment motion as

8   untimely. Dkt. 24. In the interest of fully and fairly considering Plaintiff's claims, the motion to

9   strike should be denied.

10       **C.      SUMMARY JUDGMENT - STANDARD**

11       Summary judgment is proper only if the pleadings, depositions, answers to

12  interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

13  genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

14  law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the

15  nonmoving party fails to make a sufficient showing on an essential element of a claim in the case

16  on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317,

17  323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could

18  not lead a rational trier of fact to find for the non moving party. *Matsushita Elec. Indus. Co. v.*

19  *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific,

20  significant probative evidence, not simply "some metaphysical doubt."); *See also* Fed. R. Civ. P.

21  56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence

22  supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions

23  of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v.*

24  *Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

25       The determination of the existence of a material fact is often a close question. The court

26  must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

27  e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec.*

28

1   *Serv., Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor of

2   the nonmoving party only when the facts specifically attested by that party contradict facts

3   specifically attested by the moving party.  The nonmoving party may not merely state that it will

4   discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

5   to support the claim.  *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*.

6   Conclusory, non specific statements in affidavits are not sufficient, and missing facts will not be

7   presumed.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

8   ### D.    FEDERAL CLAIMS AND QUALIFIED IMMUNITY

9        "[G]overnment officials performing discretionary functions generally are shielded from

10   liability for civil damages insofar as their conduct does not violate clearly established statutory

11   or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*,

12   457 U.S. 800, 818 (1982).  "Through application of the qualified immunity doctrine, public

13   servants avoid the general costs of subjecting officials to the costs of trial - distraction of

14   officials from their governmental duties, inhibition of discretionary action, and deterrence of able

15   people from public service."  *V-1 Oil Co. v. Smith*, 114 F.3d 854, 857 (9th Cir. 1997)(*internal

16   citations omitted)*.   The immunity is "immunity from suit rather than a mere defense to

17   liability."  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

18        The Supreme Court established a two-part analysis in *Saucier v. Katz*, 533 U.S. 194, 201

19   (2001), for determining whether qualified immunity is appropriate in a suit against a public

20   official for an alleged violation of a constitutional right.  *Boyd v. Benton County*, 374 F.3d 773,

21   778 (9th Cir. 2004), citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Although no longer

22   mandatory, the Supreme Court has recently held that it may be "beneficial" for a court required

23   to rule upon qualified immunity to examine the *Saucier* factors:  (1) whether the official violated

24   the plaintiff's constitutional rights on the facts alleged and (2) if there was a violation, whether

25   the constitutional rights were clearly established.  *Pearson v. Callahan*, 129 S.Ct. 808, (2009)

26   (holding that the *Saucier* two-part analysis was no longer mandatory).  Application of the factors

27   is beneficial here, so this opinion will first turn to whether Plaintiff's substantive due process

28

ORDER
Page 15

1   rights were violated, and then to whether Plaintiff's fourth amendment rights were violated, and

2   then to whether there is some basis to hold the individual defendants liable under § 1985.  If any

3   of these rights were violated, this opinion will then examine the second *Saucier* factor - whether

4   any of those rights were clearly established at the relevant time.

5                       1.      Violation of Substantive Due Process Right to Family Unity?

6          The Substantive Due Process Clause of the Fourteenth Amendment to the U.S.

7   Constitution protects the fundamental right of parents to make decisions concerning the care,

8   custody, and control of their children.  *Troxel v. Grandville,* 530 U.S. 57, 64 (2000).  "While a

9   constitutional liberty interest in the maintenance of the familial relationship exists, this right is

10  not absolute."  *Woodrum v. Woodward County,* 866 F.2d 1121, 1125 (9th Cir 1989).  The

11  interest of the parents must be balanced against the interests of the state in protecting the child.

12  *Id.*  The Fourteenth Amendment, then, "guarantees that parents will not be separated from their

13  children without due process of law except in emergencies."  *Mabe v. San Bernadino Co. Dept.*

14  *of Public Social Services,* 237 F.3d 1101, 1107 (9th Cir. 2001).

15         Plaintiff's substantive due process claim for violation of his right to family unity against

16  these Defendants should be dismissed.  Plaintiff makes no showing that any of the Defendants

17  here played any role the events leading up to Mr. Ray's or Ms. Curow-Ray's decision to sign the

18  Voluntary Placement Agreements.  The undisputed testimony in the record is that these named

19  Defendants had already left the scene when discussions regarding the custody of the children

20  began.  There is no evidence that any of the Defendants were contacted regarding custody of the

21  children.  There is no evidence that they participated in any manner.  Defendants' motion for

22  dismissal of this claim should be granted.

23                      2.      Violation of Fourth Amendment Right?

24         "Probable cause exists when the facts and circumstances within the officer's knowledge

25  are sufficient to cause a reasonably prudent person to believe that a crime has been committed."

26  *Lassiter v. City of Bremerton*, 556 F.3d 1049, 1053 (9th Cir. 2009) (*citing Ybarra v. Illinois*, 444

27  U.S. 85, 91 (1979)).  Plaintiff was arrested as the primary physical aggressor in a domestic

28

violence assault in the fourth degree.  In Washington, an assault in the fourth degree is committed, if "under the circumstances not amounting to assault in the first, second, or third degree, or custodial assault, he or she assaults another."  RCW 9A.36.041.  Under RCW 10.31.100 (2) (c),

> A police officer shall arrest and take into custody . . . a person without a warrant when the officer has probable cause to believe that . . . the person is sixteen years or older and within the preceding four hours has assaulted a family or household member as defined in RCW 10.99.020 and the officer believes: (i) a felonious assault has occurred; (ii) an assault has occurred which has resulted in bodily injury to the victim, whether the injury is observable by the responding officer or not; or (iii) that any physical action has occurred which was intended to cause another person reasonably to fear imminent serious bodily injury or death.  Bodily injury means physical pain, illness, or an impairment of physical condition.

To the extent Plaintiff is now making a claim under the Fourth Amendment for arrest without probable cause, his claim should be dismissed.  Plaintiff fails to show that there was no probable cause for his arrest for a domestic violence assault.  In fact, he does not dispute that he shoved Ms. Curow-Ray and that she needed medical attention for her shoulder after hitting the doorjamb.  Moreover, even though Ms. Curow-Ray states that she told the officers that she was the one that started the fight, she does not dispute the testimony in the record that Mr. Ray shoved her more than once (on one occasion causing her to suffer an elevated shoulder) and pinned her down on the couch during which her daughter became involved in the physical fight.  Plaintiff makes no showing that the officers were unaware of these facts.  Accordingly, under Washington law, the Defendant officers were required to arrest Plaintiff because they were told that within the last four hours an assault between members of a household occurred which resulted in bodily injury to the victim.  RCW 10.31.100 (2) (c).  Plaintiff complains that he was not the "primary aggressor."  Dkt. 19.  RCW 10.31.100 (2)(c) further provides that:

> When the officer has probable cause to believe that family or household members have assaulted each other, the officer is not required to arrest both persons. The officer shall arrest the person whom the officer believes to be the primary physical aggressor. In making this determination, the officer shall make every reasonable effort to consider: (i) The intent to protect victims of domestic violence under RCW 10.99.010; (ii) the comparative extent of injuries inflicted or serious threats creating fear of physical injury; and (iii) the history of domestic violence of each person involved, including whether the conduct was part of an ongoing pattern of abuse.

1   In passing the Domestic Violence Act, RCW 10.99.010, *et. seq.*, the Washington Legislature

2   stated that:

> The purpose of this chapter is to recognize the importance of domestic violence as
> a serious crime against society and to assure the victim of domestic violence the
> maximum protection from abuse which the law and those who enforce the law
> can provide. The legislature finds that the existing criminal statutes are adequate
> to provide protection for victims of domestic violence. However, previous
> societal attitudes have been reflected in policies and practices of law enforcement
> agencies and prosecutors which have resulted in differing treatment of crimes
> occurring between cohabitants and of the same crimes occurring between
> strangers. Only recently has public perception of the serious consequences of
> domestic violence to society and to the victims led to the recognition of the
> necessity for early intervention by law enforcement agencies. It is the intent of the
> legislature that the official response to cases of domestic violence shall stress the
> enforcement of the laws to protect the victim and shall communicate the attitude
> that violent behavior is not excused or tolerated. Furthermore, it is the intent of
> the legislature that criminal laws be enforced without regard to whether the
> persons involved are or were married, cohabiting, or involved in a relationship.

The officers here were presented with a situation under which they could reasonably

conclude that Mr. Ray was the primary aggressor.  While the officers observed some bruising

under Mr. Ray's eye and some scratches on his neck, they could reasonably conclude that Ms.

Curow-Ray's injuries were more extensive.  First, Mr. Ray testified that he was hurt a "very

little." Dkt. 27, at 33.  Officer Scott reports that Ms. Curow-Ray acknowledged that they had

engaged in a physical fight, and that she tried to calm down and watch a movie.  Dkt. 27, at 56-

57.  She reported to officer Scott that Mr. Ray came into the room she was in and tried to take

the DVD player she were using.  Dkt. 27, at 56-57.  Ms. Curow-Ray reported to Officer Scott

that "when [she] tried to stop him, [Mr. Ray] threw [her] over the table and onto the couch and

held [her] down, he shook [her] really hard and slapped [her.]" Dkt. 27, at 56-57.  She reported

pain in her shoulders from the incident.  *Id.*  Ms. Curow-Ray also reported they continued to

fight, and at one point that Mr. Ray "pushed [her] as he turned around to go back into the home,

causing [her] to hit the right side of her head on the doorframe, nearly knocking her

unconscious." Dkt. 27, at 56-57.  Officer Mullen's report also states that Mr. Ray acknowledged

pushing Ms. Curow-Ray.  Dkt. 27, at 54.  In addition to Mr. Ray's and Ms. Curow-Ray's

statements, T.C. testified that she told the officers about the couch incident and her involvement

in the physical fight between Mr. Ray and Ms. Curow-Ray.  Dkt. 27, at 41.  It is undisputed that

1    at one point, Mr. Ray was on top of Ms. Curow-Ray on the couch.  It is undisputed that at this

2    point T.C. jumped in the middle of the fight.  T.C. also testified that she told the officers that she

3    saw Mr. Ray cause Ms. Curow-Ray to hit the door jamb.  Dkt. 27, at 41.  Officer Scott observed

4    swelling to Ms. Curow-Ray's temple, which was consistent with both Ms. Curow-Ray's

5    statements and T.C.'s statements.  Dkt.  27, at 57.

6          Moreover, Officer Scott's conclusion that Mr. Ray reinstigated the fight and "could have

7    chosen to leave the home and return for his items later" was reasonable.  Ms. Curow-Ray

8    testified that she tried to calm down and get away from Mr. Ray by watching a movie with her

9    daughter.  Ms. Curow-Ray states that after a while Mr. Ray came into the room they were in and

10   tried to take either the DVD player or the TV, re-instigating the fight.  The officers were also

11   told of this.  Dkt. 27, at 41, 54-57.  "[D]omestic disputes present a responding officer with

12   situations involving great potential danger to occupants of the household.  If the officer hesitates

13   to act, his hesitancy may lead to the occurrence of otherwise preventable violence."  *Peng v. Mei*

14   *Chin Penghu*, 335 F.3d 970, 977 (9th Cir. 2003)(*internal citations omitted*).  To the extent that

15   Mr. Ray asserts a fourth amendment claim that there was not probable cause to arrest him for

16   domestic violence assault as the primary aggressor, his claim should be dismissed.

17          3.    Federal Constitutional Conspiracy Claim Pursuant to 42 U.S.C. § 1985

18          It is unclear upon what the Plaintiff's constitutional conspiracy claim is based.  Plaintiff

19   is not a federal officer so 42 U.S.C. § 1985(1) does not apply.  *Canlis v. San Joaquin Sheriff's*

20   *Posse Comitatus*, 641 F.2d 711, 717 (9th Cir.1981).  Plaintiff was not a party or witness in a

21   federal proceeding at the time, and so 42 U.S.C. § 1985(2) does not apply.  *Portman v. County of*

22   *Santa Clara*, 995 F.2d 898, 909 (9th Cir.1993).

23          Under 42 U.S.C. § 1985(3) - the Ku Klux Klan Act of 1871- individuals are protected

24   from conspiracies to deprive them of their legally protected rights.  *Sever v. Alaska Pulp Corp*.,

25   978 F.2d 1529, 1536 (9th Cir. 1992).  To bring a claim successfully under section 1985(3), a

26   plaintiff must allege and prove four elements:

27          (1) conspiracy, (2) for the purpose of depriving, either directly or indirectly, any
             person or class of persons of the equal protection of the laws, or of equal

28

1      privileges and immunities under the laws, and (3) an act in furtherance of the

2      conspiracy; (4) whereby a person is either injured in his person or property or
     deprived of any right or privilege of a citizen of the United States.

3 *Id.* (*internal citations omitted*).  "Further, the second of these four elements requires that in

4 addition to identifying a legally protected right, a plaintiff must demonstrate a deprivation of that

5 right motivated by some racial, or perhaps otherwise class-based, invidiously discriminatory

6 animus behind the conspirators' action."  *Id.*

7      Plaintiff points to no evidence in the record that Defendants were motivated by racial or

8 other class-based "invidiously discriminatory animus."  To the extent that Plaintiff brings a

9 conspiracy claim under 42 U.S.C. § 1985(3), it should be dismissed.

10      It is, however, "permissible to state a civil cause of action of conspiracy, based on §

11 1983."  *Cohn v. Norris,* 300 F.2d 24 (9th Cir. 1962).  A civil conspiracy is 1) a combination of

12 two or more persons, 2) who, by some concerted action, intend to accomplish some unlawful

13 objective, 3) for the purpose of harming another, 4) which results in damage.  *Vieux v. East Bay*

14 *Ridge Park Dist.,* 906 F.2d 1330, 1343 (9th Cir. 1990)(*internal citations omitted*).  "In order to

15 prove a civil conspiracy, the parties, to have conspired, must have reached a unity of purpose or

16 a common design and understanding, or a meeting of the minds in an unlawful arrangement."  *Id.*

17

18      To the extent his claim is brought pursuant to section 1983, the Defendants' motion to

19 summarily dismiss Plaintiff's claim for a civil conspiracy to violate his constitutional rights

20 should be granted.  Plaintiff has failed to point to any evidence in the record which shows that

21 Defendants engaged in a concerted action intended to deny him this constitutional rights.

22 Plaintiff does not dispute that a domestic violence incident occurred between himself and Ms.-

23 Curow-Ray.  Plaintiff makes no showing that there was no probable cause to arrest him for a

24 domestic violence assault.  Plaintiff has failed to show that his constitutional rights were violated

25 by the acts of the individual Defendants here.  A conspiracy allegation, even if established, does

26 not give rise to liability under section 1983 unless there is an actual deprivation of civil rights.

27 *Woodrum v. Woodward County, Okl.,* 866 F.2d 1121, 1126 (9th Cir. 1989)(*citations omitted*).

28

1        4.      City of Lacey and Lacey Police Department Liability under *Monell*

2        Where a plaintiff has failed to show a constitutional violation, "there can be no municipal

3    liability" under *Monell.  Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 957 (9th Cir.

4    2008).  Plaintiff has failed to show that his constitutional rights were violated under the claims

5    he asserts in his Complaint.  Accordingly, to the extent that he seeks to hold the City of Lacey or

6    the Lacey police department liable for any of the constitutional claims he currently asserts, his

7    claims against Lacey and its police department should be dismissed.  It is unclear, at this time

8    however, whether Plaintiff will attempt to assert an equal protection claim against Lacey and the

9    police department under *Monell* in his amended complaint.  This ruling does not address

10   Plaintiff's equal protection claim, if any.  Plaintiff is again reminded, though, that the law of this

11   case, including the finding that there was probable cause to find him the primary aggressor,

12   applies.

13   **E.      STATE LAW CLAIMS**

14       Defendants also move for the dismissal of Plaintiff's state law claims, asserting that they

15   are entitled to immunity under state law.  Dkts. 26 and 24.  The motion as to each is considered

16   here.

17       Washington law provides that a police officer "shall not be held liable in any civil action

18   for an arrest based on probable cause . . . or any other action or omission in good faith under this

19   chapter arising from an alleged incident of domestic violence brought by any party to the

20   incident."  RCW 10.99.070.  Under RCW 10.31.100(12), "[n]o police officer may be held

21   criminally or civilly liable for making an arrest pursuant to RCW 10.31.100 (2) or (8) if the

22   police officer acts in good faith and without malice."

23       As stated above, the officers here had probable cause to arrest Mr. Ray as the primary

24   aggressor in a domestic violence assault.  Further, Plaintiff points to no evidence in the record

25   that the officers here did not act in good faith.  Plaintiff fails to show that the officers here acted

26   with malice.  Even if the officers were not entitled to immunity to the state claims, Plaintiff's

27   state law claims should still be dismissed.

28

ORDER
Page 21

1        1.      False Arrest and Imprisonment

2        Under Washington law, false arrest or false imprisonment is the unlawful violation of a

3   person's right of liberty or the restraint of that person without legal authority. *Bender v. City of*

4   *Seattle*, 99 Wn.2d 582, 590-91 (1983).  Probable cause is a complete defense to an action for

5   false arrest and false imprisonment. *Hanson v. City of Snohomish*, 121 Wn.2d 552, 563 (1993).

6   The defendant officers here had probable cause to arrest Mr. Ray for domestic violence assault

7   as the primary aggressor, as above.  Plaintiff's claims for false arrest and false imprisonment

8   should be dismissed.

9        2.      Outrage

10       In order to maintain a claim for outrage, a plaintiff must show "(1) extreme and

11  outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual

12  result to the plaintiff of severe emotional distress." *Birklid v. Boeing Co.*, 127 Wash.2d 853, 867

13  (1995)(*internal citations omitted*).  The conduct in question must be "so outrageous in character,

14  and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as

15  atrocious, and utterly intolerable in a civilized community." *Id.*  Although whether conduct is

16  sufficiently outrageous is ordinarily a question for the jury, the trial court must decide as a

17  threshold matter, whether reasonable minds could differ about whether the conduct was so

18  extreme as to result in liability. *Dicomes v. State*, 113 Wash.2d 612, 630 (1989).

19       Plaintiff fails to meet the threshold question.  That is, reasonable minds could not differ

20  about whether the officers' decision to arrest Plaintiff here was "so extreme as to result in

21  liability," *Dicomes*, at 630.  It was not.  Plaintiff fails to point to any evidence from which a jury

22  could conclude that the decision to arrest him for domestic violence was conduct "so outrageous

23  in character, and so extreme in degree, as to go beyond all possible bounds of decency. . . ."

24  *Birklid*, at 867, in the circumstances here alleged.  This claim should be dismissed.

25       3.      Interference with Family Relations

26       In Washington, a claim of malicious interference with a family relationship requires

27  Plaintiff to show five elements:

28

ORDER
Page 22

1    1) an existing family relationship;  2) malicious interference with the relationship
2    by a third person; 3) an intention on the part of the third person that such
     malicious interference results in a loss of affection or family association; 4) a
3    causal connection between the third parties' conduct and the loss of affection; and
     5) resulting damages.

4    *Babcock v. State*,  112 Wash.2d 83, 107-08 (1989) (*internal citations omitted).*

5        Plaintiff's claim for interference with family relationships should be dismissed.  Plaintiff

6    makes no showing as to the second, third, or fourth elements.  There is no showing that the

7    officers here intentionally and maliciously acted to interfere with Plaintiff's relationship with his

8    family.  "Malicious interference" refers to unjustifiable interference.  *Babcock* at 108.  While the

9    officers, in accord with the state criminal statutes and with probable cause, arrested Plaintiff,

10   there is no evidence that they caused a loss of affection between Plaintiff and his family.

11   Moreover, there is no evidence that the Defendants here played any role in the custody decisions

12   regarding the children.  Defendants' motion to summarily dismiss this claim should be granted.

13                    4.      Negligent Hiring, Retention, Training, and Supervision

14       In Washington, to establish a prima facie case of negligence, a plaintiff must show a

15   duty, breach, proximate cause, and a resulting injury.  *Hoffer v. State*, 110 Wash.2d 415,421

16   (1988).

17       Plaintiff makes claims for negligent hiring, retention, training and supervision against the

18   City of Lacey.  Plaintiff's claims should be dismissed.  Plaintiff did not provide any evidence on

19   the standard of care for hiring, retention, training, and supervision of police officers.  *Gurno v.*

20   *Town of LaConner*, 65 Wash.App. 218, 228-29 (1992).  Plaintiff provided no evidence that there

21   was a breach of any of those standards.  Plaintiff made no showing that any breach proximately

22   caused his alleged false arrest, interference with his family relationships, or any other injury.

23       Plaintiff argues that, as to his negligent training and supervision claims, the officers did

24   not follow City of Lacey Policy 7.5.  Dkt. 19.  The policy provides:

25       If there is probable cause to believe a crime has been committed, an arrest will be
         made.  (Reference RCW 10.31.100).  Officers will arrest the primary aggressor in
26       the incident, considering such factors as who instigated the fight, who inflicted
         the most damage or injury, and/or who is the abuser in the relationship or
27       incident.  Officers may consider intoxication, past history, and physical size in
         helping to make the decision.  Unless there are extenuating circumstances, arrests

28

ORDER
Page 23

involving assaults or threats will be physically booked into a jail, if this is within the 4-hour time span given under law.

Dkt. 22, at 2-3.  Plaintiff argues that the officers acted outside their scope of employment when they failed to follow these procedures.  Dkt. 19, at 9.  Plaintiff concludes that because Mr. Ray was not the "primary aggressor" under the policy, when the individually named defendants arrested him, they acted outside their employment and so the City of Lacey is liable for the damages.  Plaintiff's position is without merit.  Plaintiff makes no showing that the officers were acting outside the scope of their employment when they exercised their discretion under state law and the local policy and determined that he was the primary aggressor.  Plaintiff makes no showing that the officers were not properly trained or supervised as to this policy.  Plaintiff merely disagrees with the officers' decision.  Defendants' motion to summarily dismiss Plaintiff's claims for negligent hiring, retention, training, and supervision should be granted.

### III.   ORDER

Therefore, it is hereby, **ORDERED** that:

•   Plaintiff's Motion to Amend his Complaint (Dkt. 14) is **DENIED WITHOUT PREJUDICE**;

•   Plaintiff **MAY FILE** his Proposed Amended Complaint alleging an equal protection violation on or before August 27, 2010;

•   Defendants' Motion to Strike (Dkt. 24) is **DENIED**;

•   Plaintiff's Motion to Strike (Dkt. 19) is **DENIED**;

•   Defendants' Motion for Summary Judgment (Dkt. 26) is **GRANTED.**

The Clerk of the Court is instructed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

DATED this 10th day of August, 2010.

Robert J Bryan
United States District Judge

ORDER
Page 24